

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JO ANNE PEPITONE<br>    Plaintiff<br>    v.<br>TOWNSHIP OF LOWER MERION<br>    and<br>TOWNSHIP OF LOWER MERION<br>POLICE DEPARTMENT<br>    and<br>POLICE SUPERINTENDENT<br>MICHAEL J. MCGRATH<br>    Defendants | CIVIL ACTION NO. 19-1447<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

### I. INTRODUCTION

1. Plaintiff, Jo Anne Pepitone (Pepitone), brings this action under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e), *et seq.* (Title VII), 42 U.S.C. § 1983 and the Equal Protection Clause of the 14th Amendment, and the Pennsylvania Human Relations Act, 43 Pa.C.S.A. § 951 *et seq.* (PHRA). Defendants discriminated against Pepitone because she's a woman, subjected her to a sexually hostile and gender discriminatory work environment and then retaliated against her for complaining about sexual harassment. Pepitone seeks compensatory and punitive damages (punitive damages sought against Police Superintendent Michael McGrath in his individual capacity under Section 1983), interest, costs, injunctive and declaratory relief and attorneys' fees from Defendants, Township of Lower Merion (LM), Township of Lower Merion Police Department (LMPD) and LMPD Superintendent Michael J. McGrath (Superintendent McGrath) in his official and individual/aiding and abetting capacities.

APR -5 2019

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f). Furthermore, Defendants' conduct with regard to Pepitone violated the PHRA, and the pendant jurisdiction of this Court is invoked to remedy those violations.

3. Pepitone has exhausted all remedies available to her as set forth in Title VII and the PHRA by filing timely charges with the Equal Employment Opportunity Commission, which charges were dual filed with the Pennsylvania Human Relations Commission, and Pepitone has filed this action within ninety (90) days of the receipt of the EEOC's notice of right-to-sue.

4. The unlawful acts and practices of Defendants were committed within or upon the direction of Defendants' agents or by Defendants themselves within the Eastern District of Pennsylvania.

## III. PARTIES

5. Pepitone is a female residing in Chester County, PA.

6. LM is located in Montgomery County and borders the City of Philadelphia. At nearly 24 square miles in area, LM is the largest of the 62 municipalities in Montgomery County. Several nationally recognized colleges and universities are located within LM, including Bryn Mawr College, Harcum College, Haverford College, Rosemont College and St. Joseph's University. As of the 2016 U.S. Census, LM had a population of over 58,000, with nearly 24,000 households. LM has the 5th highest per-capita income and the 12th highest median household income in the United States with a population of 50,000 or more.

7. With more than 150 employees, LMPD is the third largest public police force in Pennsylvania behind only Philadelphia and Pittsburgh. LMPD's credo is 'integrity, professionalism and respect'.

8. Superintendent McGrath has worked for LMPD for 37 years. He worked his way up through the ranks from Sergeant, Lieutenant, Captain and then Superintendent as of 2009.

9. Upon information and belief, no female has ever held the positions of Lieutenant, Captain or Superintendent in the history of LMPD.

10. All of the Defendants are employers within the meaning of Title VII and the PHRA.

## IV. FACTUAL BACKGROUND

11. Pepitone started working at a police officer for LM/LMPD in May 2008.

12. In February 2015, LM/LMPD promoted Pepitone to the position of Sergeant.

13. In February 2016, LM/LMPD issued Pepitone an Employee Development Report (a performance review). LM/LMPD gave her an overall rating of consistently meets expectations and offered the following comments about her:

   a. Her work habits exceed expectations. She is highly organized and always ready to address the platoon at roll call and prepare them for their upcoming shift. Her work produce is accurate, neat and complete.

   b. She exceeds in her response to supervision. She has solicited and easily accepted suggestions and advice as needed.

   c. She is very dependable. Her response to questions is immediate and she can be relied upon to complete complex assignments. She achieved perfect attendance.

14. In February 2017, LM/LMPD again rated Pepitone as consistently meeting all expectations and offered the following comments about her:

   a. She is very dependable and has achieved perfect attendance for the second straight year.

   b. She is usually the first Sgt. at work and is always prepared for roll call.

3

15. Throughout Pepitone's tenure at LM/LMPD, there have been numerous sexually charged rumors circulating throughout the police department. These rumors have contributed to creating a sexually hostile and gender discriminatory hostile work environment.

16. Pepitone has been the subject of some of the rumors. The rumors about Pepitone suggested she had engaged in sexual relationships with her supervisors and members of neighboring police departments.

17. These types of rumors have become part of an accepted sexually harassing and gender discriminatory culture within LMPD that Superintendent McGrath has facilitated, approved, condoned or turned a blind eye to.

18. Here are a few examples showing how LM/LMPD is infested with a culture of accepted sexually harassing and gender discriminatory conduct:

    a. In June 2016, former LMPD Officer Colin Ryan (Ryan) texted Pepitone a nude photo of himself. Pepitone had previously learned from Sgt. Gerald Chreiman that Ryan said that he and Pepitone were having a sexual relationship, which was false. When Pepitone received Ryan's text, she responded that she did not believe his text was meant for her, but he texted her back to say it was meant for her.

    b. In January 2017, Officer Razzette told several LMPD Officers that Pepitone had sexual relationships with a Sgt. from Haverford Police Department and another Sgt. from Radnor Police Department. Officer Razzette knew or should have know what he said was false.

    c. In March 2017, members of the LMPD Emergency Response Team (ERT) openly discussed whether the above-referenced Sgt. from Haverford Police Department was the person Pepitone was sleeping with.

    d. In April 2017, Sgt. Stinger repeatedly joked around with other male LMPD Officers about my police vehicle being in the same area as the Sgt. from Haverford Police Department.

    e. Later in April 2017, Pepitone attended a FOP banquet. During the banquet, Sgt. Jason Tammaro spoke about the beginning of his relationship with his wife, an Officer in LMPD, and how they dated when they were in the same squad while he was her supervisor. The next day, Lt. Baitinger said the Sgt.

4

        Tammaro should have been demoted because of his relationship with a subordinate.

    f.  Several days later at a ERT training, members of the ERT discussed whether Pepitone brought 'her man', implying she was in a relationship with the Sgt. From Haverford Police Department.

    g.  Following roll call in late May 2017, Sgt. Stinger informed Pepitone that he was concerned because a Watch Commander asked him about Pepitone's relationship with the Sgt. from Haverford Police Department. Pepitone informed Sgt. Stinger that her relationship with the Sgt. from Haverford Police Department was strictly professional and his improper conduct was the source of the salacious rumors.

    h.  In about mid-June 2017, Sgt. Colflesh attempted to track Pepitone via the GPS in her police vehicle. Sgt. Colflesh did this in an attempt to show that Pepitone was engaging in a sexual relationship with the Sgt. from Haverford Police Department.

    i.  Several days later, Pepitone confronted Sgts. Stinger and Colflesh. She told Sgt. Stinger that he and Sgt. Colflesh were creating a hostile work environment for her by spreading rumors about her sex life. Sgt. Stinger responded by saying his comments were 'made in jest'. Pepitone told Sgt. Stinger that while he may consider his comments in jest, others at LMPD may take what he says as true, especially since he was Pepitone's partner at the time. Pepitone then told Sgt. Colflesh she did not appreciate his comments and his efforts to track her location. Sgt. Colflesh attempted to justify his actions by offering a bogus justification he knew was not true.

    j.  Pepitone also spoke with Officer Razzette and told him she did not appreciate him telling members of LMPD that she was having multiple sexual relationships with members of other police departments.

    k.  In about mid-July 2017, Peptione's then husband William Pepitone received a phone call from an unidentified male who said that his wife was having sex with a member of her platoon, Officer [Doe]. The unidentified male provided Mr. Pepitone with Officer Doe's wife's name and phone number. Officer Razzette is the only person who knew Officer Doe's wife name and phone number, which was provided to Mr. Pepitone.

    l.  A few days later, Pepitone met Officer Doe, who she had been accused of having sex with, in the parking lot of Villanova University to discuss the phone call Pepitone's husband had received. After being there for only a few minutes, Villanova Public Safety inquired why Pepitone and Officer Doe were parked there.

m. About a month later, Officer Razzette told Officer Doe 'I guess you're not going to be going to parking lots of Villanova University any time soon." Officer Doe told Officer Razzette that his meeting with Pepitone last month was not sexual in nature.

n. About a month later in the later part of September 2017, Officer Razzette informed Sgt. Chreiman about Pepitone's meeting in the parking lot at Villanova. Sgt. Chreiman informed the Watch Commander and LMPD subsequently opened an investigation regarding Pepitone's relationship with Officer Doe.

o. In mid-October 2017, Lt. Tucci told Pepitone he needed to speak with her regarding her relationship with Officer Doe. Pepitone informed Lt. Tucci that she and Officer Doe were now in a relationship. Lt. Tucci told her she had done nothing wrong, this was not a discipline matter and there were no policy violations.

p. Shortly thereafter, LMPD advised Pepitone that her platoon was changing from 14-Car in Platoon 4 to 15-Car in Platoon 3. Although this did not negatively impact Pepitone's pay, her new platoon assignment was less senior and less prestigious.

q. Sgts. Stinger and Maier, both males, also had their platoon assignments changed, however both had performance deficiencies that resulted in their platoon changes, unlike Pepitone, who was not advised of any issues with her performance but received the same negative platoon treatment that her male co-workers did who had performance deficiencies.

r. In late January 2018, Pepitone learned that rumors had circulated to neighboring police departments that Pepitone was demoted due to a sexual relationship she was having with a male colleague.

s. In mid-February 2018, Pepitone spoke with Lt. Polo, Sgt. Dougherty and Sgt. Ruggierio regarding the ongoing rumors. Pepitone was told 'that is how this place works.'

t. Two days later, Lt. Tucci requested Pepitone meet him at human resources. When Pepitone got to human resources, she was informed that LMPD was concerned about what she had said to Lt. Polo and was referring her to LMPD's mental health services. Lt. Tucci told Pepitone that LMPD could not stop people from talking and Captain Thomas, who was also present, asked what they could do to make her feel more comfortable at work. During this meeting, Lt. Tucci acknowledged knowing about rumors about Pepitone and that no one had ever investigated these rumors.

u. After this meeting, Pepitone contacted LMPD's mental health services. She was told she was referred to them because she was 'being intimate with a subordinate in a vehicle'. Pepitone contacted Lt. Tucci who denied that's why LMPD referred her to mental health services.

19. Throughout Pepitone's tenure at LMPD, there have been numerous rumors about female members of LMPD. Members of LMPD's Command Staff knew about at least some of the rumors over the years and failed to take prompt and effective remedial actions to prevent this sexually harassment, gender discriminatory and female-demeaning conduct.

20. There were rumors about Sgt. Bell and Pepitone, Sgt. Dougherty and Pepitone and Sgt. Ruggierio and Pepitone when she was subordinate to each of them. There was a rumor that Pepitone was promoted because of a sexual relationship she supposedly had with her supervisor at the time, Lt. Polo.

21. LMPD never investigated any of the rumors involving male supervisors and Pepitone, the female subordinate.

22. The ongoing rumors have undermined Pepitone as a female officer and as a supervisor.

23. On April 3, 2018, Pepitone emailed a sexual harassment, discrimination and retaliation complaint to LMPD Superintendent McGrath, LM Manager Ernie McNeely and LM HR Manager Beth Lilick.

24. On April 17, 2018, Pepitone met with an investigator to discuss her complaint.

25. On April 21, 2018 following roll call on Pepitone's first day back at work since her April 17 interview, several officers asked her if she was okay. It was apparent to Pepitone that now there were gossip and rumors about her sexual harassment, discrimination and retaliation complaint.

7

26. On April 23, 2018, Pepitone received her first negative evaluation in her 10 years at LMPD. Although Pepitone's evaluation period ended February 23, 2018, it was not until after she made a formal sexual harassment, discrimination and retaliation complaint that Lt. Baitinger delivered her evaluation, two months after the evaluation period had ended and much later than Pepitone typically received her yearly evaluations. When Lt. Baitinger gave Pepitone her evaluation, Lt. Tucci was present in the room, apparently as a 'witness'. Lt. Tucci did not even acknowledge Pepitone's presence in the room, even though he was her watch commander during the evaluation period.

27. LM/LMPD gave Pepitone a negative evaluation because of her repeated sexual harassment complaints and because she was a female dating a male subordinate.

28. After receiving the negative evaluation, Pepitone met with Lt. Baitinger. She said she was surprised by the negative evaluation because she had been informed on multiple occasions that she had no performance deficiencies.

29. At LPMD, relationships involving male supervisors and female subordinates are accepted and part of the culture. However, when LMPD suspected Pepitone, a female, was having a relationship with a male subordinate, LMPD launched an investigation.

30. When LMPD investigated Pepitone's relationship with Officer Doe, Pepitone was not Officer Doe's supervisor. However, Sgt. Tammaro was Officer Melanie Hoffman's direct supervisor when they were in a relationship and LMPD never investigated their relationship or took any negative action against either. In fact, LMPD allowed Officer Hoffman to continue working for Sgt. Tammaro for three months after their relationship was unquestionably public knowledge at LMPD and there was never any investigation about this.

31. On May 5, 2018, Pepitone filed a sexual harassment and retaliation complaint with the EEOC. LMPD was aware Pepitone filed an EEOC complaint no later than about a month later in early June 2018.

32. LM/LMPD hired Patrick Harvey, a lawyer at the Bala Cynwyd law firm of Campbell, Durrant, Beatty, Palumbo, & Miller, P.C. to investigate Pepitone's April 3, 2018 internal sexual harassment, discrimination and retaliation complaint.

33. Over the next 6-7 months, Attorney Harvey interviewed witnesses and purportedly investigated Pepitone's sexual harassment, discrimination and retaliation complaint.

34. On September 28, 2018, LM HR Manager Beth Lilick and LM Assistant Manager Bob Duncan attended a mediation for Pepitone's complaint at the EEOC in Philadelphia. Pepitone and her counsel were also at the mediation. Another lawyer from Attorney Harvey's law firm represented LM/LMPD at the EEOC mediation. No resolution of Pepitone's sexual harassment, discrimination and retaliation claims was reached at the mediation.

35. On October 25, 2018, nearly seven months after Pepitone made her formal internal sexual harassment, discrimination and retaliation complaint, Pepitone met with LM Manager McNeely, LMPD Superintendent McGrath, LM Assistant Manager Duncan and LM Director of HR Lilick (her title had changed since April 2018 when she was LM's HR Manager).

36. Despite the specificity and breadth of Pepitone's allegations, LM told her that she was not subject to a hostile work environment. LM claimed that six people were found to have violated LM policy and they will be disciplined, however before the alleged disciplined would be imposed LMPD Superintendent McGrath needed to review the witness interview transcripts.

37. Pepitone was also told that Director of HR Lilick was supposedly going to look into advanced harassment/workplace training, however that was not going to happen until 2019. Pepitone was told that LMPD was going to implement a no fraternization policy.

38. Toward the end of this meeting, LMPD Superintendent McGrath told Pepitone that she was being placed on a performance improvement plan (PIP).

39. LM/LMPD issued the bogus PIP to Pepitone in a blatant attempt to force her to quit or continue to make her work experience intolerable.

40. LM/LMPD issued Pepitone the PIP in retaliation for her prior sexual harassment, discrimination and retaliation complaints and to intimidate her to shut up and stop complaining.

41. LM/LMPD subjected and is subjecting Pepitone to a sexually hostile, gender discriminatory and hostile work environment.

42. LM/LMPD discriminated against and is discriminating against Pepitone because she's a woman.

43. LM/LMPD retaliated and is retaliating against Pepitone because she complained about sexual harassment, discrimination and retaliation.

44. Pepitone has suffered, is now suffering and will continue to suffer emotional distress, embarrassment, humiliation, inconvenience, mental anguish, professional/reputational damage and other losses as a direct result of Defendants' illegal conduct.

45. Upon information and belief, Defendants' discriminatory, harassing and retaliatory treatment of Pepitone is pursuant to a practice and policy of LM/LMPD to discriminate against women, subject women to a sexually harassing and gender discriminatory hostile work environment and retaliate against anyone who complains about sexual harassment or sex discrimination.

46. Upon information and belief, Defendants were and are aware of the rampant sexual harassment, gender discriminatory and retaliatory conduct at LMPD.

47. Defendants engaged in intentional discrimination and retaliation against Pepitone with malice or reckless indifference to her rights under Title VII.

48. LMPD Superintendent McGrath knew about the rampant sexually harassing, gender discriminatory and retaliatory conduct described above and facilitated, approved, condoned or turned a blind eye to it for years.

49. LMPD Superintendent McGrath exhibited reckless or callous disregard of, or indifference to, the rights of Pepitone.

**V.    CLAIMS**

### Count I – Sexual Harassment
### Title VII and PHRA

50. Paragraphs 1 through 49 are incorporated by reference as if fully set forth herein.

51. The acts, failures to act, practices and policies of Defendants set forth above constitute sexual harassment in violation of Title VII and the PHRA.

52. LMPD Superintendent McGrath aided and abetted in LM/LMPD's harassing conduct against Pepitone.

53. As a result of Defendants' illegal sexual harassment, Pepitone has suffered harms and losses in the form of emotional distress including, but not limited to, professional/reputational damage, anxiety, stress, humiliation and embarrassment.

WHEREFORE, Pepitone respectfully demands judgment in her favor and against Defendants, jointly and/or severally, for compensatory damages, attorney's fees plus costs, declaratory relief that the conduct engaged in by Defendants violated Pepitone's civil rights,

equitable/injunctive relief directing Defendants to cease any and all unlawful sexual harassment and such other relief as the Court shall deem proper.

### Count II – Sex Discrimination
### Title VII and PHRA

54. Paragraphs 1 through 49 are incorporated by reference as if fully set forth herein.

55. The acts, failures to act, practices and policies of Defendants set forth above constitute sex discrimination in violation of Title VII and the PHRA.

56. LMPD Superintendent McGrath aided and abetted in LM/LMPD's discriminatory conduct against Pepitone.

57. As a result of Defendants' illegal sex discrimination, Pepitone has suffered harms and losses in the form of emotional distress including, but not limited to, professional/reputational damage, anxiety, stress, humiliation and embarrassment.

WHEREFORE, Pepitone respectfully demands judgment in her favor and against Defendants, jointly and/or severally, for compensatory damages, attorney's fees plus costs, declaratory relief that the conduct engaged in by Defendants violated Pepitone's civil rights, equitable/injunctive relief directing Defendants to cease any and all unlawful sexual harassment and such other relief as the Court shall deem proper.

### Count III - Retaliation
### Title VII and PHRA

58. Paragraphs 1 through 49 are incorporated by reference as if fully set forth herein.

59. The acts, failures to act, practices and policies of Defendants set forth above constitute retaliation (including retaliatory harassment) against Pepitone in violation of Title VII and the PHRA.

12

60. LMPD Superintendent McGrath aided and abetted in LM/LMPD's retaliatory conduct against Pepitone.

61. As a result of Defendants' illegal retaliatory conduct, Pepitone has suffered harms and losses in the form of emotional distress including, but not limited to, professional/reputational damage, anxiety, stress, humiliation and embarrassment.

WHEREFORE, Pepitone respectfully demands judgment in her favor and against Defendants, jointly and/or severally, for compensatory damages, attorney's fees plus costs, declaratory relief that the conduct engaged in by Defendants violated Pepitone's civil rights, equitable/injunctive relief directing Defendants to cease any and all unlawful sexual harassment and such other relief as the Court shall deem proper.

### Count IV – Sexual Harassment/Sex Discrimination
### Section 1983 – 14th Amendment Equal Protection

62. Paragraphs 1 through 49 are incorporated by reference as if fully set forth herein.

63. At all times relevant hereto, LM/LMPD and Superintendent McGrath were acting pursuant to municipal/county custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Pepitone.

64. LM/LMPD is a public entity and it acted under color of state law.

65. LM/LMPD intentionally discriminated against Pepitone and subjected her to a sexually harassing hostile work environment.

66. LM/LMPD failed to promptly or effectively remediate the sexually harassing and gender discriminatory work environment Pepitone has endured for years pursuant to an established practice, policy, procedure, and/or custom to routinely tolerate sexual harassment of female police officers and gender discriminatory treatment of female police officers.

67. Superintendent McGrath is sued in his official capacity because he is a person as defined in 42 U.S.C. §1983; he deprived Pepitone of her right to be treated equally under the Fourteenth Amendment; acted under color of state law; and caused Pepitone harm.

68. Superintendent McGrath is sued in his individual capacity for his violation of Pepitone's Equal Protection rights under the Fourteenth Amendment to the United States Constitution, for his motives or interests in ensuring Pepitone endured a sexually harassing and gender discriminatory work environment and his callous indifference to Pepitone's rights.

69. As a result of Defendants' discriminatory actions, practices, procedures, and policies, Pepitone has sustained, and will continue to sustain, emotional distress, including career damage.

70. In addition to compensatory damages, Pepitone is entitled to recover punitive damages against Superintendent McGrath under 42 U.S.C. § 1983 because his actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Pepitone.

WHEREFORE, Pepitone respectfully demands judgment in her favor and against LM/LMPD and Superintendent McGrath (in his official and individual capacity), jointly and/or severally, for compensatory damages for emotional distress, mental anguish, career damage, humiliation and embarrassment, punitive damages (from Superintendent McGrath in his individual capacity only), attorneys' fees plus costs, declaratory relief that the conduct engaged in by Defendants violated Pepitone's civil rights, equitable/injunctive relief directing Defendants to cease any and all unlawful sexual harassment and sex discrimination against female employees and such other relief as the Court shall deem proper.

Respectfully submitted,

By: \_\_\_SMP2861_____
Scott M. Pollins/Tashell J. Jenkins
**Pollins Law**
Pa. Atty. Id. Nos. 76334/
303 W. Lancaster Ave., Ste. 1C
Wayne, PA 19087
(610) 896-9909 (phone)
(610) 896-9910 (fax)
scott@pollinslaw.com/tashell@pollinslaw.com (email)

Attorneys for Plaintiff,
Jo Anne Pepitone

Date: \_\_4/5/19_____

15

## VERIFICATION

I, Jo Anne Pepitone, hereby aver that the statements in the forgoing Complaint are true and correct to the best of my knowledge information and belief. I understand that it is unlawful to make any materially false, fictitious, or fraudulent statement to a court of the United States and that violations can be punished by a fine or by imprisonment.

*[Signature]* 4/5/19
Jo Anne Pepitone

Date: 4/5/19